**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EDMOND ARAKELIAN and ANNI ARAKELIAN, | : : : | |
| Plaintiffs, | : : : | Civil Action No. 08-5286 (JAG) |
| v. | : : | **OPINION** |
| N.C. COUNTRY CLUB ESTATES LIMITED PARTNERSHIP, TOLL BROTHERS, INC., and TBI MORTGAGE, INC., | : : : : : | |
| Defendants. | : : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion of defendants N.C. Country Club Estates Limited Partnership, Toll Brothers, Inc., and TBI Mortgage, Inc. (collectively, "Defendants"), to dismiss the Complaint and compel plaintiffs Edmond and Anni Arakelian ("Plaintiffs") to arbitrate the claims they state in the Complaint. (Docket No. 5.) For the reasons stated below, Defendants' motion to compel arbitration is granted; and Defendants' motion to dismiss the Complaint is denied. The litigation is stayed pending arbitration of Plaintiffs' claims.[1]

---

[1]The Third Circuit has held that the proper course of action for a District Court that grants a motion to compel arbitration is to stay – not dismiss – the matter pending arbitration. See Lloyd v. HOVENSA, LLC., 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he plain language of [9 U.S.C.] § 3 . . . clearly states, without exception, that whenever suit is brought on an arbitrable

1

**BACKGROUND**

Plaintiffs are husband and wife, and are citizens of the state of New Jersey.  (Compl. ¶ 1.)

Defendant N.C. Country Club Estates Limited Partnership ("Country Club Estates") is a limited partnership organized under the laws of North Carolina, with its principal place of business in Waxhaw, North Carolina.  (Id. ¶ 2.)  Defendant Toll Brothers, Inc. ("Toll Brothers") is a corporation established under the laws of Delaware, with its principal place of business in Horsham, Pennsylvania.  (Id. ¶ 3.)  Defendant TBI Mortgage Company ("TBI Mortgage") is a corporation established under the laws of Pennsylvania, with its principal place of business in Horsham, Pennsylvania.  (Id. ¶ 4.)  Country Club Estates and TBI Mortgage were, at all times relevant to the Complaint, wholly owned subsidiaries of, and agents for, Toll Brothers.  (Id. ¶¶ 7-8.)

Plaintiffs' allegations are as follows.  Plaintiffs became aware of a Toll Brothers real estate development, known as Marvin Creek Estates ("Marvin Creek").  (Id. ¶ 10.)  Plaintiffs' interest initially arose as a result of advertising by Toll Brothers, which Plaintiffs viewed on their home computer in New Jersey.  (Id. ¶ 10.)  Apparently in response to an inquiry from Plaintiffs, Toll Bothers filled out a "Reservation Deposit Agreement," dated January 31, 2007, which Plaintiffs signed.  (Id. ¶ 11.)  In addition, Plaintiffs tendered a $1,000 deposit to Toll Brothers on February 1, 2007.  (Id.)

In February 2007, Plaintiffs visited Marvin Creek, which is located in Waxhaw, North Carolina.  (Id. ¶ 9.)  Plaintiffs were encouraged by Toll Brothers to apply for a mortgage.  (Id. ¶

---

claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded.").

2

12.)  Toll Brothers promised Plaintiffs that if they obtained their mortgage from TBI Mortgage, Toll Brothers would provide Plaintiffs a $2,500 credit toward mortgage expenses and closing costs.  (Id. ¶ 12.)  Toll Brothers encouraged Plaintiffs to apply for a "No Doc" mortgage, which Plaintiffs describe as "a mortgage which would be granted without requiring proof of income, employment, assets, or liabilities."  (Id.)  A "No Doc" mortgage application does not require a credit check and property appraisal.  (Id.)  Based on Toll Brothers' representations, Plaintiffs filled out a "Qualification Questionnaire" and consented to a credit check.  (Id. ¶ 13.)

On February 27, 2007, Plaintiffs received a letter dated February 14, 2007 that stated, "Congratulations, you have been credit approved for a mortgage loan through TBI Mortgage Company!"  (Id. ¶¶ 14-15.)  The letter further provided that Plaintiffs had been granted a "30 year fixed (no doc) mortgage."  (Id. ¶ 16.)

At approximately the same time that the credit approval letter was sent to Plaintiffs, they received from Toll Brothers a proposed Agreement of Sale for the house Plaintiffs had decided to purchase.  (Id. ¶¶ 17, 19; Certification of Counsel, Defendants' Exhibit A ("Defs.' Ex. A").)  The Agreement of Sale, dated February 26, 2007, named Country Club Estates as the Seller and specified a base purchase price of $663,975.  (Compl. ¶¶ 17-18; Defs.' Ex. A.)  Added costs associated with options selected by Plaintiffs brought the total purchase price to $848,595.  (Compl. ¶ 20; Defs.' Ex. A.)

The Agreement of Sale was executed by Plaintiffs on March 12, 2007.  (Compl. ¶ 17; Defs.' Ex. A.)  Plaintiffs signed the Agreement of Sale without consulting an attorney, and Toll Brothers did not inform Plaintiffs of their right to consult an attorney.  (Compl. ¶ 17.)  The Agreement of Sale did not contain an attorney review clause, or any language referencing an

3

attorney.  (Id.; Defs.' Ex. A.)

 The Agreement of Sale also did not contain a mortgage contingency clause.  (Compl. ¶
19; Defs.' Ex. A.)  It did, however, contain a "Mortgage Application" clause, which required
Plaintiffs to submit an application to TBI Mortgage within fourteen days of execution.  (Compl. ¶
19; Defs.' Ex. A ¶ 3.)  The clause also permitted, but did not require, Plaintiffs to apply to any
other mortgage lender for a mortgage.  (Id.)

 The Agreement of Sale also contained an arbitration clause which stated:

> **Arbitration:**  Buyer, on behalf of Buyer and all permanent residents of the Premises,
> including minor children, hereby agree[s] that any and all disputes with Seller, Seller's
> parent company or their subsidiaries or affiliates arising out of the Premises, this
> Agreement, the Home Warranty, any other agreements, communications or dealings
> involving Buyer, or the construction or condition of the Premises including, but not
> limited to, disputes concerning breach of contract, express and implied warranties,
> personal injuries and/or illness, mold-related claims, representations and/or omissions by
> Seller, on-site and off-site conditions and all other torts and statutory causes of action
> ("Claims") shall be resolved by binding arbitration in accordance with the rules and
> procedures of Construction Arbitration Services, Inc. ("CAS") or its successor or an
> equivalent organization mutually agreed upon by the parties.  If CAS is unable to arbitrate
> a particular claim, then that claim shall be resolved by binding arbitration pursuant to the
> Construction Rules of Arbitration of the American Arbitration Association or its
> successor or an equivalent organization mutually agreed upon by the parties.  In addition,
> Buyer agrees that Buyer may not initiate any arbitration proceeding for any Claim(s)
> unless and until Buyer has first given Seller specific written notice of each claim (at 250
> Gibraltar Road, Horsham, PA 19044, Attn: Warranty Dispute Resolution) and given
> Seller a reasonable opportunity after such notice to cure any default, including the repair
> of the Premises, in accordance with the Home Warranty.  The provisions of this
> paragraph shall be governed by the provisions of the Federal Arbitration Act, 9 U.S.C. §§
> 1 et seq. and shall survive settlement.

(Defs.' Ex. A ¶ 11.)

 Pursuant to the "Reservation Deposit Agreement," Plaintiffs issued three checks to
Country Club Estates.  (Compl. ¶ 21.)  The checks were in the amounts of $32,198, $17,000, and
$19,964.  (Id.)  These amounts were tendered as down payments on the house, the lot premium,

and additional options Plaintiffs selected for their house, respectively.  (Id.)  In addition,

Plaintiffs executed and delivered to Country Club Estates a promissory note for $33,199.  (Id.)

On or about April 17, 2007, TBI Mortgage issued a mortgage loan commitment to

Plaintiffs for a loan in the amount of $560,000.  (Id. ¶ 22; Pls.' Ex. A.)  The commitment expired

on June 1, 2008.  (Compl. ¶ 22; Certification of Counsel, Plaintiffs' Exhibit A ("Pls.' Ex. A").)

Sometime in the middle of 2007, however, Plaintiffs were contacted by Chris Mason ("Mason"),

a mortgage specialist at TBI Mortgage.  (Compl. ¶ 23.)  Mason told Plaintiffs that TBI Mortgage

could not meet its mortgage commitment to Plaintiffs.  (Id.)  The reason that Mason gave was

that TBI Mortgage did not offer "this program anymore."  (Id.)  The communication between

Mason and Plaintiffs was not in writing.  (Id.)

Plaintiffs demanded an explanation in writing from TBI Mortgage and, in reply, received

a document entitled, "Statement of Credit Denial, Termination, or Change" ("Statement of

Denial")  dated April 21, 2008.  (Id. ¶ 24; Certification of Counsel, Plaintiffs' Exhibit B ("Pls.'

Ex. B.").)  The Statement of Denial listed four reasons for the termination of TBI Mortgage's

mortgage commitment to Plaintiffs.  (Compl. ¶ 24; Pls.' Ex. B.)  The reasons were:  (1)

"insufficient income"; (2) "excessive obligations"; (3) unspecified information regarding

Plaintiffs in a credit report received from a consumer reporting agency; and (4) that TBI

Mortgage "do[es] not grant credit to any applicant on the terms and conditions you have

requested."  (Compl. ¶ 24; Pls.' Ex. B.)

Following receipt of the Statement of Denial, Plaintiffs contacted Toll Brothers, who

advised Plaintiffs to apply for a mortgage from a different provider.  (Compl. ¶¶ 26-27.)  Toll

Brothers made arrangements for Plaintiffs to contact a mortgage broker, who applied,

unsuccessfully, to Bank of America for a mortgage on Plaintiffs' behalf.  (Id. ¶ 27.)

Plaintiffs contacted Toll Brothers to request that they return Plaintiffs' deposit, and cancel and return the promissory note executed by Plaintiffs.  (Id. ¶ 28.)  Toll Brothers counseled Plaintiffs that Toll Brothers would discuss Plaintiffs' options with them after the closing date, when Plaintiffs would be in default.  (Id. ¶ 29.)  Plaintiffs believed that their deposit might be applied to a different house, or that another arrangement satisfactory to them would be made. (Id. ¶ 30.)  After the closing date passed, however, Toll Brothers informed Plaintiffs that they (Plaintiffs) had forfeited the deposit funds, and Toll Brothers demanded that Plaintiffs make payment on the promissory note in the amount of $33,199.  (Id. ¶ 31.)

On October 27, 2008, Plaintiffs filed a five-count Complaint in this Court.  The Complaint stated claims for:  (1) breach of contract by TBI Mortgage; (2) breach of duty of good faith and fair dealing by Defendants; (3) unfair and deceptive trade practice by Defendants; (4) promissory estoppel with regard to promises and assurances made by Defendants; and (5) declaratory judgment.  Plaintiffs seek damages of $70,162 plus interest and the costs of suit; a declaratory judgment that the $33,199 Promissory Note is void and unenforceable; and any further relief that this Court deems equitable and just.

On April 7, 2009, Defendants filed the pending Motion To Dismiss Plaintiffs' Complaint As To N.C. Country Club Estates Limited Partnership, Toll Brothers, Inc. and TBI Mortgage, Inc. ("Motion").  (Docket No. 5.)  This Court addresses Defendants' Motion below.

## JURISDICTION

Jurisdiction is proper with this Court under 28 U.S.C. § 1332(a).  Plaintiffs' and Defendants' citizenship is diverse, and the amount in controversy exceeds $75,000.  Venue is

proper in this Court, pursuant to 28 U.S.C. § 1391(a)(3).

## CHOICE OF LAW

As a preliminary matter, this Court must determine which state's law applies to this Motion.  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (in deciding whether the parties agreed to arbitrate the claims at issue, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts").  A federal court with diversity jurisdiction must apply the choice of law principles of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  Neither party addresses the necessary choice of law inquiry in their briefs.[2]  For the reasons explained below, this Court holds that North Carolina provides the substantive contract law that governs this dispute.

Under New Jersey law, the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties.  Keil v. Nat'l Westminster Bank, 710 A.2d 563, 569 (N.J. Super. Ct. App. Div. 1998); State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,  417 A.2d 488, 491-92 (N.J. 1980).  To determine which state has more significant contacts with the parties and the contract, New Jersey courts look to the following non-exclusive contacts listed in § 188 of the Restatement (Second) of Conflict of Laws:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business

---

[2]The Agreement of Sale does not contain a choice of law provision.  (See Defs.' Ex. A.) Both parties appear to believe that New Jersey law applies, and cite extensively to New Jersey law.  Neither party, however, explains why New Jersey law should apply to the Motion.

of the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1969); e.g., Keil, 710 A.2d at 569-70.

In addition, courts consider the factors relevant to the applicable rule of law in § 6 of the

Restatement:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those
> states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1969); Gen. Ceramics Inc. v. Firemen's

Fund Ins. Cos., 66 F.3d 647, 653 (3d Cir. 1995).

There is a presumption that the law of the place of contracting should apply to the

interpretation of the contract –

> Because the law of the place of contract "generally comport[s] with the
> reasonable expectations of the parties" concerning the applicable and
> controlling legal principles, "that forum's law should be applied unless
> the dominant and significant relationship of another state to the parties or
> the underlying issue dictates that this basic rule [should] yield."

Keil, 710 A.2d at 569 (quoting Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629

A.2d 885, 888 (N.J. 1993)).

Analysis of the Restatement § 188 factors indicates that North Carolina has the most

significant contacts with the parties and the contracts at issue here.  In particular, this Court finds

determinative the location of the subject matter of the two contracts – the Agreement of Sale and

the Mortgage Loan Commitment.

Analysis of the first, second, third, and fifth § 188 factors do not weigh strongly in favor

8

of the application of one particular state's laws.  Regarding the first factor – the place of contracting – it is unclear where contracting occurred.  Plaintiffs' Complaint implies that they received the Agreement of Sale from Defendants in New Jersey.  (See Compl. ¶ 17 ("At or about the same time the credit approval letter was forwarded to the plaintiffs, they received a proposed agreement of sale for the house they had decided to purchase.").)  In their opposition brief, however, Plaintiffs state that they signed the contract "hundreds of miles from home" without indicating where they were.  (Opp. 10.)  There is no evidence or allegation as to where Country Club Estates executed the contract.  The place of contracting for the Agreement of Sale is unclear.

Similarly, the place of contracting for the Mortgage Loan Agreement is unclear.  It appears that Plaintiffs submitted their mortgage application from North Carolina.  (See Compl. ¶¶ 11-14 ("Toll Brothers personnel encouraged plaintiffs to apply for a mortgage through defendant TBI [Mortgage]. . . . [P]laintiffs filled out a Toll Brothers Qualification Questionnaire and consented to a credit check.  Plaintiffs then returned to their home in New Jersey until they received from defendant TBI [Mortgage] a "credit approval letter" . . .).)

There is nothing in the record as to where TBI Mortgage approved Plaintiffs' loan.  The first § 188 factor does not assist this Court in its choice of law determination.

Regarding the second § 188 factor, the place of contract negotiation, none of the parties to this suit claim that there was any negotiation.  Hence, there is no mention of the location of any negotiation regarding the terms in the Agreement of Sale or the Mortgage Loan Agreement.

As to the third § 188 factor, the place of performance, both contracts at issue impliedly call for performance by parties in multiple states.  The Agreement of Sale specifies that title to

9

the home will be provided to Plaintiffs, in exchange for Plaintiffs' down payments and ability to secure a mortgage. The location of Country Club Estates' performance is North Carolina, the location of the home at issue. The location of Plaintiffs' performance may be New Jersey, from where they presumably sent down payments to Defendants and the mortgage application to TBI Mortgage. TBI Mortgage, incorporated and located in Pennsylvania, would presumably undertake its mortgage responsibilities from Pennsylvania. The third § 188 factor does not assist this Court with the choice of law determination.

The fifth § 188 factor, the domicil, residence, nationality, place of incorporation and place of business of the parties, is not helpful for this Court. Plaintiffs are citizens of, and reside in, New Jersey. Country Club Estates is a North Carolina corporation, with its principal place of business in North Carolina. TBI Mortgage is a Pennsylvania corporation, with its principal place of business in Pennsylvania. Toll Brothers is a Delaware corporation, with its principal place of business in Pennsylvania. Thus, the fifth factor weighs equally in favor of selecting the law of New Jersey, North Carolina, Pennsylvania, or Delaware.

As the above analysis indicates, the first, second, third, and fifth § 188 factors do not provide much guidance as to which state's law applies here.

The fourth § 188 factor, however, militates strongly in favor of finding that North Carolina law applies. The fourth factor is the location of the subject matter of the contract. The home that is the subject matter of both contracts is located in North Carolina. This is the only factor that militates strongly in favor of the application of one state's laws over the laws of any other state.

The choice of North Carolina law is reinforced by the Restatement § 6 factors. In

10

particular, North Carolina has a greater interest in having its law apply to contracts for the sale of a home or a mortgage for a home within its borders than do New Jersey, Pennsylvania, or Delaware (the other states whose laws could apply, based on the § 188 factors). Additionally, the parties would have been justified in expecting that North Carolina law would apply to a dispute regarding the purchase of, and mortgage for, a home in North Carolina. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(d) (1969).

North Carolina law therefore applies to this contract dispute.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, memorializes the strong congressional policy favoring arbitration.[3] As a general matter, public policy favors arbitration. See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr., 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.") (quoted in Raspet v. Buck, 554 S.E.2d 676, 678 (N.C. Ct. App. 2001); Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989) ("[A]mbiguities as to the scope of the arbitration clause [must be] resolved in favor of arbitration.").

Notwithstanding the well-established policy in favor of arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986) (citations omitted); see also Raspet, 554 S.E.2d at 678 ("[B]efore a dispute can be

---

[3]The FAA was implemented "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration on the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991).

ordered resolved through arbitration, there must be a valid agreement to arbitrate.") (citations omitted).

"The question whether the parties have submitted a particular dispute to arbitration . . . is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (internal quotations and citations omitted).  Under North Carolina contract law, the determination involves a two-step inquiry:  "(1) whether the parties had a valid agreement to arbitrate, and also (2) whether 'the specific dispute falls within the substantive scope of that agreement.'" Raspet, 554 S.E.2d at 678 (quoting PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990)).

## ANALYSIS

Defendants move to dismiss the Complaint and compel Plaintiffs to arbitrate their claims, pursuant to the arbitration clause in the Agreement of Sale.  Defendants contend that the arbitration clause between themselves and Plaintiffs constitutes a valid, binding agreement, and that state and federal law requires enforcement of the arbitration agreement.

In opposition to the Motion, Plaintiffs make three arguments:  (1) Plaintiffs claims against TBI Mortgage are outside of the scope of the arbitration clause; (2) Plaintiffs did not agree to arbitrate any claims between themselves and TBI Mortgage; and (3) the arbitration clause is unconscionable, and therefore unenforceable with respect to Plaintiffs' claims against all Defendants.  Plaintiffs' first argument implicates the second question this court must answer, whether the specific dispute falls within the substantive scope of the arbitration clause.  Id. Plaintiffs' second and third arguments implicate the first question, whether the parties had a valid agreement to arbitrate.  Id.

12

## I.      Did The Parties Have A Valid Agreement To Arbitrate?

Having decided that North Carolina law applies to this dispute, the first inquiry that this

Court must make is whether the parties have made a valid agreement to arbitrate their disputes.

Id.  Defendants point out, and Plaintiffs do not contest, that Plaintiffs signed the Agreement of

Sale, which contained an arbitration clause.  Plaintiffs, however, make two arguments that the

arbitration clause is invalid.  First, they argue that their claims against Defendant TBI Mortgage

are not covered by the arbitration clause, because TBI Mortgage is not a party to the clause.

Second, Plaintiffs argue that the arbitration clause is unconscionable and unenforceable as to

their claims against all Defendants.

Under FAA § 2, "an agreement in writing to submit an existing controversy arising out of

[a transaction involving commerce] shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Generally

applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to

invalidate arbitration agreements without contravening § 2 so long as those defenses arose to

govern issues concerning the validity, revocability, and enforceability of contracts generally.

Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996) (citations omitted).  The

party challenging a contract provision under § 2 generally bears the burden of proving an

applicable contract defense. E.g., Lloyd v. HOVENSA, LLC., 369 F.3d 263, 274 (3d Cir. 2004).

### A.      Claims Against TBI Mortgage

Plaintiffs first argue that their claims against TBI Mortgage are not bound by the

arbitration clause in the Agreement of Sale, because TBI Mortgage was not a party to that

contract.  There is no question that TBI Mortgage is not a named party to the arbitration clause in

the Agreement of Sale.  The Agreement of Sale is between Country Club Estates and Plaintiffs.
(Defs.' Ex. A.)  The only mention of TBI Mortgage in the contract is the requirement that
Plaintiffs submit a mortgage application to TBI Mortgage.  (Id. ¶ 3.)  This Court is therefore
required to consider whether there are any grounds on which TBI Mortgage may enforce the
arbitration clause in the Agreement of Sale against Plaintiffs.  There are such grounds, and TBI
Mortgage may enforce the arbitration clause against Plaintiffs.

      Under North Carolina law, "[t]he obligation and entitlement to arbitrate 'does not attach
only to one who has personally signed the written arbitration provision.'  Rather, '[w]ell-
established common law principles dictate that in an appropriate case a nonsignatory can enforce,
or be bound by, an arbitration provision within a contract executed by other parties.'"  Ellen v.
A.C. Schultes of Maryland, Inc., 615 S.E. 729, 732 (N.C. Ct. App. 2005) (quoting Washington
Square Sec., Inc. v. Aune, 385 F.3d 432, 435 (4th Cir. 2004) (alteration in original)).

      Turning to the language of the arbitration clause, this Court finds it susceptible to an
interpretation which allows TBI Mortgage to enforce its terms.  The clause states that it covers
"any and all disputes with Seller, Seller's parent company or their subsidiaries or affiliates."
(Defs.' Ex. A. ¶ 11.)  The Agreement of Sale defines Country Club Estates as Seller, so the
question is whether TBI Mortgage is "Seller's parent company or their subsidiaries or affiliates."
The Complaint alleges that both TBI Mortgage and Country Club Estates are wholly owned
subsidiaries and agents of Toll Brothers.  (Compl. ¶¶ 7-8.)  Therefore, it appears that TBI
Mortgage is not Country Club Estates' parent company.

      What is unclear is whether TBI Mortgage is contemplated as one of "their subsidiaries or
affiliates."  This confusion arises in part due to the loose use of the pronoun "their," which could

either refer to "Seller" or "Seller's parent company." If "their" refers to "Seller," it is ambiguous whether the clause contemplates TBI Mortgage, because it is unclear whether TBI Mortgage and Country Club Estates are affiliates – "affiliate" is not defined in the contract. Further, while Plaintiffs allege that both TBI Mortgage and Country Club Estates are wholly owned subsidiaries and agents of Toll Brothers, they do not allege that TBI Mortgage and Country Club Estates are affiliates of one another. Some evidence of a direct relationship between them, however, is found in a separate contract provision that requires the Buyer to submit a mortgage application to TBI Mortgage. (Defs.' Ex. A. ¶ 3.) It is unclear whether that relationship renders TBI Mortgage an "affiliate" of Country Club Estates.

If, on the other hand, "their" refers to "Seller's parent company," it is clear that TBI Mortgage is contemplated by the clause. Plaintiffs allege that TBI Mortgage is a subsidiary of Toll Brothers. (Compl. ¶ 8.)

In ordinary circumstances, North Carolina law specifies that ambiguity in contract language like that described above is construed against the drafter. Novacare Orthotics & Prosthetics E., Inc. v. Speelman, 528 S.E.2d 918, 921 (N.C. Ct. App. 2000) (ambiguous written instruments shall be construed against the drafter, who is "the party responsible for choosing the questionable language"). Because, however, the ambiguity here occurs in the context of an arbitration clause, the ambiguity must be resolved in favor of arbitration. Volt Info., 489 U.S. at 476. Plaintiffs' claims against TBI Mortgage are thus governed by the arbitration clause.

**B.      Unconscionability**

Plaintiffs also argue that Defendant's Motion should not be granted because the

Agreement of Sale is a contract of adhesion, and the arbitration clause therein is a

unconscionable and unenforceable.  This Court disagrees.

The North Carolina Supreme Court has held that unconscionability is a ground for

invalidating an arbitration clause:

> [E]quity may require the invalidation of an arbitration agreement that is unconscionable.
> A court will find a contract to be unconscionable only when the inequality of the bargain
> is so manifest as to shock the judgment of a person with common sense, and where the
> terms are so oppressive that no reasonable person would make them on the one hand, and
> no honest and fair person would accept them on the other. . . .
>
> A party asserting that a contract is unconscionable must prove both procedural and
> substantive unconscionability. . . . [P]rocedural unconscionability involves "bargaining
> naughtiness" in the form of unfair surprise, lack of meaningful choice, and an inequality
> of bargaining power.  Substantive unconscionability, on the other hand, refers to harsh,
> one-sided, and oppressive contract terms.  Of course, unconscionability is ultimately a
> determination to be made in light of a variety of factors not unifiable into a formula.
> Therefore, we note that while the presence of both procedural and substantive problems is
> necessary for an ultimate finding of unconscionability, such a finding may be appropriate
> when a contract presents pronounced substantive unfairness and a minimal degree of
> procedural unfairness, or vice versa.

Tillman v. Commercial Credit Loans, Inc., 655 S.E.2d 362, 369-70 (N.C. 2008) (internal

quotation and citation omitted).

In the present case, Plaintiffs argue that the arbitration clause is procedurally

unconscionable because it was presented to Plaintiffs in a contract of adhesion, was printed in the

same fine print as the remainder of the contract, and was presented under circumstances where

Plaintiffs did not have the advice of counsel.

The Agreement of Sale is a preprinted contract, and Plaintiffs had little or no ability to

negotiate the vast majority of its terms.  Of the sixteen provisions in the contract, it appears that

16

only two have been altered in any way specific to Plaintiffs' purchase.  One of the altered

provisions details the location, lot number, style, and price of the home Plaintiffs are contracting

to purchase from Country Club Estates, as well as the financial details of that transaction.  (Defs.'

Ex. A ¶ 1.)  The other altered provision specifies the amount of money Plaintiffs agree to pay as a

non-refundable one-time contribution to the homeowners association upon closing.  (Id. ¶ 14.)

The remainder of the contract contains boilerplate language.  Additionally, the arbitration clause

is on the third page of a four-page contract, and is not distinguished in appearance from any of

the other contract terms.[4]

     These facts, however, do not constitute a showing sufficient to establish procedural

unconscionability.  The North Carolina Supreme Court held that a party seeking to avoid

enforcement of an arbitration clause in the context of a loan closing makes a sufficient showing

to establish procedural unconscionability where that party establishes that it was rushed through

the process of the loan closing, there was no mention during the loan closing of the arbitration

clause by the party seeking its enforcement, where the party seeking enforcement would have

refused to make a loan rather than negotiate over the terms of the arbitration agreement, and

where the party seeking enforcement unquestionably has greater bargaining power.  Tillman, 655

S.E.2d at 370.

     Here, Plaintiffs do not establish, or even assert, that they were rushed through the

_____

     [4]This Court does not give any weight to Plaintiffs' argument that the contract was
presented to them "hundreds of miles from their home," without the opportunity to gain the
advice of counsel.  (Opp. 10.)  Unconscionability is a fact-based inquiry, and the party asserting
unconscionability bears the burden of proof.  Tillman, 655 S.E.2d at 369.  Plaintiffs provide no
factual basis on which this Court can credit their claims regarding where the contract was signed,
whether they were rushed to sign, or if they had the opportunity to seek advice from counsel.

Agreement of Sale, that Country Club Estates neglected to mention the existence of an arbitration clause, or that Country Club Estates would have refused to make the sale rather than negotiate over the terms of the arbitration agreement.  In addition, while it is possible to assume a certain level of bargaining inequity, Plaintiffs do not establish that they were unable to comprehend the Agreement's terms.  This Court reads <u>Tillman</u> to imply that Plaintiffs' showing is insufficient to establish procedural unconscionability.

Regarding substantive unconscionability, the gravamen of Plaintiffs' argument is that arbitration of the claims asserted here will be substantially more expensive than litigation in court.  "'[T]he existence of large arbitration costs' could serve as the basis for holding an arbitration clause unenforceable."  <u>Tillman</u>, 655 S.E.2d at 371 (quoting <u>Green Tree Fin. Corp.-Ala. v. Randolph</u>, 531 U.S. 79, 90 (2000)).  Where a party seeks non-enforcement of an arbitration clause based on the high costs of arbitration, that party must sufficiently demonstrate the likelihood of incurring such costs.  <u>Green Tree</u>, 531 U.S. at 91-92; <u>see also</u> <u>Bradford v. Rockwell Semiconductor Sys., Inc.</u>, 238 F.3d 549, 556 (4th Cir. 2001) (an inquiry into arbitration costs as a ground for unconscionability must be "a case-by-case analysis that focuses . . . upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims.").

The arbitration clause here provides that claims shall be resolved in accordance with the rules and procedures of Construction Arbitration Services, Inc. ("CAS"), its successor, or an equivalent organization mutually agreed to by the parties.  (Defs.' Ex. A ¶ 11.)  If CAS is unable to arbitrate a particular claim, then the claim shall be arbitrated by the American Arbitration

18

Association ("AAA"), pursuant to its Construction Rules of Arbitration.  (Id.)

Plaintiffs argue that CAS does not conduct arbitration relating to breach of contract claims, so the costs associated with conducting arbitration pursuant to the AAA's rules must be analyzed.  Plaintiffs imply that because CAS "clearly deals with claims relating to construction and physical problems with real property," it is not be capable of resolving Plaintiffs' claims that arise from the Mortgage Loan Commitment. (Opp. 10.)  In support of this argument, Plaintiffs present a page from CAS' website, which details the rules applicable to different types of disputes.  (Certification of Counsel, Plaintiffs' Exhibit C ("Pls.' Ex. C").)  The complete listing of dispute types includes:  home inspection disputes, home warranty disputes, real property disclosure disputes, residential construction disputes, and (unspecified, presumably other) construction disputes.  (Id.)

Defendants counter that "one of the primary areas handled by CAS is disputes involving breach of contract," and states that CAS "holds itself out to the public as an entity who routinely handles breach of contract cases."  (Reply 7-8.)  "Clearly," they argue, "a nationally recognized arbitration service[] such as CAS . . . is suitable for handling this matter."  (Id.)  It is not so clear to this Court, however, that CAS provides suitable rules for this dispute.  Defendants do not provide any evidence that CAS does, in fact, handle breach of contract claims.  In contrast, the printout provided by Plaintiffs lists the rules applicable to the different types of disputes that CAS handles – a list of disputes that does not include anything that appears to relate to Plaintiffs' claims.  (Pls.' Ex. C .)

Thus, because it is possible that arbitration, pursuant to CAS rules, may not be possible, this Court must inquire whether the costs imposed by arbitration under the alternative rules

designated by the arbitration clause are such that they render the arbitration clause unenforceable.

Plaintiffs allege that, because of the size of their claims, they would be required to pay fees in accordance with AAA's Commercial Fee Schedule. (Opp. 10.) Plaintiffs argue that those fees include at least an initial filing fee of $950, a case service fee of $300, and one-half the arbitrator's compensation.[5] (Id. 10-11.) They argue that these fees amount to a substantial financial burden. (Id. 11.) This financial burden, however real, is not sufficient to show that arbitration would be so costly as to preclude Plaintiffs from effectively vindicating their rights in the arbitral forum. Green Tree, 531 U.S. at 90. Because Plaintiffs offer no evidence that they are unable to pay the fees associated with arbitrating their claims, the arbitration costs cannot be found prohibitive. Bradford, 238 F.3d at 556; cf. Tillman, 655 S.E.2d at 371(finding that the costs associated with arbitration were prohibitively expensive in part because "the evidence of plaintiffs' financial means [was] uncontested.")

Plaintiffs here, like the plaintiff in Bradford, and unlike the plaintiffs in Tillman, do not present any evidence that they are unable to pay the fees that will likely be imposed should Defendants' motion to compel arbitration be granted. Plaintiffs' failure to claim that they are unable to pay the fees likely to be imposed in arbitration is fatal to their claim that the costs associated with arbitration are substantively unconscionable.

In order for a contract clause to be found unconscionable, both procedural and substantive unconscionability must be established. Because this Court finds that the arbitration clause here is neither procedurally nor substantively unconscionable, Plaintiffs' argument that the clause is

_____

[5]The fees quoted are apparently related to fees in Certification of Counsel, Plaintiffs' Exhibits D and E.

unconscionable and unenforceable is denied.

## II.    Does The Dispute Fall Within The Arbitration Clause?

Having answered the first inquiry, whether the parties entered into a valid arbitration agreement, in the affirmative, this Court turns to the second inquiry:  does this dispute fall within the language of the arbitration agreement.  Raspet, 554 S.E.2d at 678.  This Court holds that it does.

Plaintiffs argue that its claims against Defendants do not arise out of the Agreement of Sale, which contains the arbitration clause.  (Opp. 6.)  Rather, Plaintiffs assert that the claims arise out of the Mortgage Loan Commitment, a separate contract that does not contain an arbitration clause.  (Id.)  Defendants counter that Plaintiffs' claims are expressly encompassed under the arbitration clause in the Agreement of Sale.  (Reply 3.)

Ambiguities as to the scope of an arbitration clause must be resolved in favor of arbitration.  Volt Info., 489 U.S. at 476.  The arbitration clause, in relevant part, states that "any and all disputes with Seller, Seller's parent company or their subsidiaries or affiliates arising out of the Premises, this Agreement, the Home Warranty, any other agreements, communications or dealings involving Buyer . . . including, but not limited to, disputes concerning breach of contract," shall be resolved by binding arbitration.  (Defs.' Ex. A ¶ 11.)  In addition, the Agreement of Sale requires the Buyer to submit a mortgage application to TBI Mortgage.  (Id. ¶ 3.)  Both the plain language of the arbitration clause, and the requirement that Buyer submit a mortgage application to TBI Mortgage lead this Court to conclude that Plaintiffs' claims are within the arbitration clause.

The plain language of the arbitration clause states that disputes concerning breach of

contract arising out of "this Agreement . . . [or] any other agreements, communications or dealings involving Buyer." While the foregoing provision is overly broad – the arbitration clearly could not compel Plaintiffs to arbitrate claims unrelated in any manner to the Agreement of Sale, as a literal reading of "any other agreements, communications or dealings involving Buyer" would imply – this Court construes the arbitration clause to broadly cover all disputes arising from, or related to, the Agreement of Sale. When considered in conjunction with the requirement that Plaintiffs apply for a mortgage from TBI Mortgage, it is apparent that the intent of the contract provision was to cover any disputes arising out of the Mortgage Loan Agreement. The Mortgage Loan Agreement is "an[] other agreement . . . involving Buyer" that is closely related to the Agreement of Sale. Plaintiffs' claims all arise from Defendants' alleged wrongdoing, with respect to the Mortgage Loan Agreement.

Thus, the claims are well within the ambit of the arbitration clause in the Agreement of Sale.

## CONCLUSION

For the reasons explained above, Defendant's motion to compel arbitration is granted, and this Court stays the litigation pending the completion of arbitration.[6]

_____
JOSEPH A. GREENAWAY, JR., U.S.D.J.

December 18th, 2009

_____

[6]See footnote 1, supra.

22